Robert PRITCHETT; Ben Pritchett; Marietta Garage, Incorporated, Plaintiffs–Appellees,

v.

R.N. ALFORD, Individually and in his Official Capacity as Colonel in the South Carolina Highway Patrol; W.E. Williford, Individually and in his Official Capacity as Corporal in the South Carolina Highway Patrol; K.E. Payne, Individually and in his Official Capacity as Trooper First Class in the South Carolina Highway Patrol, Defendants–Appellants,

and

J.H. Lanier; Aaron Taylor; D.G. Kimbrell, in his Official Capacity as Colonel in the South Carolina Highway Patrol, Defendants.

No. 91–1652.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1992.

Decided Aug. 19, 1992.

As Amended Sept. 28, 1992.

W. Howard Boyd, Jr., Gibbes & Clarkson, Greenville, S.C., argued (Michael T. Smith, on brief), for defendants-appellants.

Thomas E. Maddox, Jr., Thomas E. Maddox, Jr., P.C., Atlanta, Ga., argued (William J. Sussman, North Augusta, S.C., on brief), for plaintiffs-appellees.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

Officers of the South Carolina Highway Patrol appeal the district court's interlocutory order denying them summary judgment on qualified immunity grounds for claims brought against them under 42 U.S.C. § 1983. Robert Pritchett (Robert) claimed under Section 1983 that certain of the officers violated his Fourth and Fourteenth Amendment rights by arresting him without probable cause for allegedly violating South Carolina laws governing solicitation of towing business by wrecker companies. The Marietta Garage, Inc. (the Garage) and its owner, Ben Pritchett (Ben), claimed under Section 1983 that certain of the officers violated their right to procedural due process under the Fourteenth Amendment by summarily removing the Garage from a wrecker-referral list administered by the South Carolina Highway Patrol. Because we conclude that under the specific circumstances of this case Robert had a clearly established right under the Fourth Amendment not to be arrested, we affirm the district court's refusal to grant summary judgment for the officers on that issue. Because we also conclude that the right to procedural due process claimed by Ben was clearly established under the specific circumstances of this case, and that any reasonable officer should have been aware that summarily removing Ben's business from the state's list would violate that right, we also affirm the district court's rejection of the officers' defense of qualified immunity as to that claim.

## I

The South Carolina Department of Highways and Public Transportation, exercising its statutory grant of power under S.C.Code Ann. § 56–5–6180 (Law.Co-op. 1991), has promulgated regulations to ensure the orderly and fair conduct of wrecker companies operating within the state. South Carolina's wrecker regulations provide that any driver involved in an automobile accident who is not incapacitated or otherwise unavailable has a right to the wrecker service of his choice. When the driver is incapacitated, unavailable, or expresses no preference, the Highway Patrol officer on the scene must summon a wrecker service. S.C.Code Regs. § 63–600(A)(2) (1989). Each Highway Patrol district is required to establish zones within the district and prepare a list of available wrecker services from each zone. § 63–600(A)(8). The wrecker service to be called to a given accident is chosen from that list on a rotating basis. The rotating "wrecker list" in each zone must be "administered fairly and in a manner designed to ensure that all wrecker services on the list have an equal opportunity to the towing business arising from the rotation list." § 63–600(A)(10). Wreckers are to "respond" to accidents "only upon the request of the proper police authorities." § 63–600(A)(9). According to deposition testimony by Colonel Lanier, then the ranking officer of the South Carolina Highway Patrol, and by Captain Alford, the officer responsible for removing the Marietta Garage from the wrecker list, any wrecker company or person who establishes a wrecker business reasonably can expect to be placed on the list and remain on the list if they meet certain technical qualifications set out in the wrecker regulations.

The basic historical facts are not in dispute. On the evening of June 6, 1989, an automobile accident occurred in Marietta, South Carolina. The local volunteer fire department received a report that one of the vehicles was on fire and that an occupant was trapped. Robert, an employee of

the Garage and a volunteer fireman, was dispatched by the fire department to the scene of the accident. He drove to the accident in a wrecker belonging to the Garage because, he asserted, his wife was using his car and no other vehicle was available.

The reported automobile fire turned out to be a false alarm. No one was trapped in a vehicle and there was only a small brush-fire by the side of the road and a smoldering rag in the back of a pickup truck involved in the accident. Robert helped extinguish those fires.

Although the firemen arrived at the scene within minutes, the Highway Patrol, in the person of Trooper Payne, did not arrive until well over an hour after the accident. Payne was late in part because his supervisor, Corporal Williford, had summoned him to headquarters on the way to the accident and instructed Payne to notify him if Robert was at the accident scene with a wrecker. According to Williford, he had received complaints from other wrecker services that Robert had been violating the wrecker regulations by soliciting towing business when the Garage's name was not at the top of the wrecker list.

Immediately upon arriving at the accident scene, Payne launched into an investigation of Robert's presence, rather than the accident.[1] Fire Chief McMakin, who was in charge of the accident scene when Payne arrived, told Payne that Robert had used the wrecker for transportation only, and that Robert had remained at the accident scene under his orders. Further investigation by Payne revealed that Robert had made no attempt to solicit towing business at the scene, and that, in fact, two other wrecker services had been summoned for the purpose of removing the disabled vehicles. After consultation with Lieutenant Ellis, a superior officer who is not a defendant in this action, Payne told Robert to leave the scene, and Robert complied.

Corporal Williford then arrived at the accident scene. After being told that Robert had been present with a wrecker, but

---

1. Transcripts of police radio broadcasts reveal that while the investigation of Robert's presence was going on, a drunk-driving suspect was spirited away from the scene by his family.

had not solicited business, Williford ordered Payne to summon Robert back to the scene and issue him a citation for violating Regulation R63–600A(9) of the wrecker regulations. Robert and Chief McMakin were summoned and the citation was issued. The citation was later *nolle prossed.*

While the citation against Robert was pending, defendant Captain Alford, then the Highway Patrol District Supervisor, suspended the Garage from the wrecker list for ninety days because its employee, Robert, allegedly had violated the wrecker regulations. The Garage and its owner, Ben Pritchett, received no notice before being removed from the list, and no pre-deprivation hearing. The regulation governing suspensions from the wrecker list gives the Highway Patrol District Supervisor total discretion to remove any company from the list, and does not provide for a hearing. *See* S.C.Code Regs. § 63–600(B) (1989).

At the end of the ninety day suspension period, on Alford's order, Corporal Kimbrell inspected the Garage to determine whether it complied with the wrecker regulations, and could be placed again on the wrecker list. After inspecting the premises and consulting by telephone with Alford, Kimbrell informed Ben that the storage fees charged by the Garage exceeded customary charges in the area, and as such were unreasonable and in violation of the wrecker regulations. *See* § 63–600(A)(15). The Garage was told to lower its storage fee or remain excluded from the list. The Garage refused to lower its fee and the

suspension continued until some time before this action was brought.[2]

Approximately two years before the events that gave rise to this lawsuit, Robert and Ben had provided information to a Highway Department internal investigation of a "kickback" scheme in which highway patrol officers allegedly solicited money from wrecker companies in exchange for calling them to the scene of accidents before their names appeared at the top of the rotating wrecker list. The record indicates that Payne and Williford, the two officers responsible for arresting Robert, were aware of Robert and Ben's participation in the investigation. Several officers were dismissed as a result of the investigation. Payne was implicated, but ultimately was exonerated. Robert and Ben have contended in this litigation that the officers' actions were in retaliation for their participation in the investigation.

Robert, Ben and the Garage brought this action under 42 U.S.C. § 1983 and state tort law against the various officers. In his § 1983 claim, Robert claimed arrest without probable cause in violation of the Fourth and Fourteenth Amendments. In theirs, Ben and the Garage claimed a denial of procedural due process in the removal of the Garage from the wrecker list. The affected officers moved for summary judgment as to each of the § 1983 claims on qualified immunity grounds. Robert, Ben and the Garage moved for "partial" summary judgment on their respective § 1983 claims 766 F.Supp. 442 (D.S.C.1991).[3]

2. The record reflects that the officers' determination that the fees were too high was based on their unsubstantiated general impressions. The record also indicates that other garages in the area—garages included on the wrecker list—charged the same fee for storage.

3. As originally structured, the action included § 1983 and pendent state-law claims by Robert against Payne, Williford, Alford, and Lanier, in their individual and official capacities, alleging unconstitutional arrest under § 1983 and malicious prosecution under state law and seeking money damages; a § 1983 claim by Ben and the Garage against Alford, Lanier, and Kimbrell, in their individual and official capacities, alleging a denial of procedural due process, and seeking both money damages and injunctive relief; and

a pendent state-law claim for defamation against a state officer Taylor. The action has been considerably pared down from its beginnings. Lanier, Alford, and Kimbrell were first dismissed from Robert's § 1983 and malicious prosecution claims as non-responsible parties. The § 1983 claim for injunctive relief against Lanier, who no longer is an official of the state, and the pendent state-law claim for defamation against Taylor were later voluntarily dismissed. The district court then dismissed the § 1983 due process claim for money damages against Lanier and Kimbrell in their individual capacities, and still later, dismissed all claims for money damages against all defendants in their official capacities.

Accordingly, the only claims still in the case are Robert's § 1983 and pendent state malicious

As to Robert's false arrest claim, the district court ruled as a matter of law that the arrest violated Robert's Fourth Amendment rights, and denied the officers' motion for summary judgment made on qualified immunity grounds. As to that defense, the court held that genuine issues of material fact made summary judgment inappropriate and required trial.

As to Ben's and the Garage's procedural due process claim, the court ruled as a matter of law that Officer Alford's summary removal of the Garage from the wrecker list violated the claimants' procedural due process rights, and that Alford's qualified immunity defense failed as a matter of law. In consequence, the court entered partial summary judgment for Ben and the Garage on the issue of liability, leaving only damages for trial.

The officers appealed from the orders denying their respective motions for summary judgment on grounds of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Only the issue of the propriety of those orders is therefore before us on this appeal.

## II

We first summarize the interrelated qualified immunity and summary judgment principles that control our review of the district court's orders.

■ The test of qualified immunity for police officers sued under 42 U.S.C. § 1983 is whether in performing discretionary functions, they have engaged in conduct that violates "clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Immunity may thus be established either on the basis that the right allegedly (or actually) violated was not at the time one "clearly established," or that, though "clearly established" (and violated), it was one that a "reasonable" person in the officer's position could have failed to appreciate would be violated by his conduct. *Mitchell*, 472 U.S. at 535, 105 S.Ct. at 2820 ("decisive fact is not that [the officer's] position turned out to be incorrect, but that the question was open at the time he acted").

■ Ruling on a defense of qualified immunity therefore requires (1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate that right. The first two of these present pure questions of law for the courts. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The third, which involves application of *Harlow's* objective test to the particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct. *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987).

■ In determining whether the specific right allegedly violated was "clearly established," the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged. *Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3039; *Tarantino v. Baker*, 825 F.2d 772, 774–75 (4th Cir.1987). And the determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time, *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039, or that was then reasonably available to him, *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736; *Sevigny v. Dicksey*, 846 F.2d 953, 957 n. 5 (4th Cir.1988), and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions. *See Malley v.*

prosecution claims for money damages against Payne and Williford, and Ben and the Garage's § 1983 procedural due process claim against Alford seeking money damages in his individual capacity and injunctive relief in his official capacity. Of these, only the two § 1983 claims are implicated in this appeal and within those, only the two qualified immunity rulings.

*Briggs,* 475 U.S. 335, 350, 106 S.Ct. 1092, 1100, 89 L.Ed.2d 271 (1986) (Powell, J., concurring in part and dissenting in part). The tolerance thus accorded by the qualified immunity defense to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection to "all but the plainly incompetent or those who knowingly violate the law," *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096, in order to avoid undue inhibitions in the performance of official duties. *Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038.

Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged. *See Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39 (subjective component of good faith test abandoned in order to increase possibility for pretrial establishment); *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815 (interlocutory appeal from denials of defense authorized).

■■■ This does not mean, however, that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment. Here, as in any context, summary judgment for the movant is appropriate only if (1) there are no genuine issues of material fact, and (2) on the undisputed facts the defendant as movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737; *Turner v. Dammon,* 848 F.2d 440, 443 (4th Cir.1988). As indicated, the narrow threshold question whether a right allegedly violated was clearly established at the appropriate level of inquiry and at the time of the challenged conduct is always a matter of law for the court, hence is always capable of decision at the summary judgment stage. Whether the con-

duct allegedly violative of the right actually occurred or, if so, whether a reasonable officer would have known that that conduct would violate the right, however, may or may not be then subject to determination as a matter of law. If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815.

■■■ With these interrelated, basic principles of qualified immunity and summary judgment doctrine in mind, we turn to review of the district court's denial of summary judgment on qualified immunity grounds as to both the claims at issue. That review is *de novo, Higgins v. E.I. Du Pont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir.1988), though with the respect properly due the district court's special opportunity for mastery of a summary judgment record developed under its jurisdiction.

### III

Ruling on the parties' cross-motions for summary judgment on Robert's Fourth Amendment claim, the district court held (1) that Robert's constitutional right to be free from arrest under the specific circumstances was clearly established,[4] but (2) that whether a reasonable police officer in the defendants' position would have known so was dependent upon certain facts in genuine issue on the summary judgment record, so that (3) summary judgment for the defendants on qualified immunity grounds was inappropriate. We agree with the ultimate determination that the officers were not entitled to summary judgment, but by a somewhat different analysis.

### A

Analyzed at the appropriate level, the right in issue was the right not to be arrested except upon probable cause to be-

---

**4.** As earlier noted, the court further concluded in giving "partial summary judgment" to Robert on this claim, that the officers had violated the right. Though that ruling may be thought nec-

essarily subsumed in the court's rejection of the qualified immunity defense, it is not technically before us on this interlocutory appeal.

lieve that Robert had violated South Carolina Highway Department Regulation R63–600(A)(9), which provides, under penalty of criminal and civil sanctions, that

> Wreckers shall respond only upon the request of the proper police authorities.

"Probable cause," for Fourth Amendment purposes, means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. De Fillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979).

 Whether probable cause exists in a particular situation therefore always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. *See Sevigny*, 846 F.2d at 956. Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both. *See id.* at 958–59 (legal misapprehension of statute's coverage). In consequence, a court's determination whether a constitutional right not to be arrested under particular circumstances was "clearly established" requires identification both of the facts known to the arresting officer and the contours of the criminal offense asserted as the justification for arrest. The right may then be found "clearly established," hence violated, at this level of factual particularity if probable cause is lacking on either or both the factual knowledge or legal understanding components of the equation. *See id.* at 956.

 Here, the officers' immunity defense has been rested throughout only on contentions respecting the legal contours of the offense charged. Essentially conceding that at the time of arrest they knew that Robert had not solicited any wrecker business and had come to the scene in his volunteer fireman's role, they have contended in effect that even so his conduct violated the regulation under which he was cited. In taking this position, they argue essentially that it is a strict liability offense: that coming in a wrecker to the scene of a wreck except in response to a police call is a *per se* violation of the regulation. On their interpretation, even a stop at a wreck scene by a passing wrecker to render Good Samaritan aid would violate the regulation. Their contention in effect therefore is that not only did Robert have no "clearly established" right not to be arrested, they had a "clearly established" right under the regulation to arrest him.

 The district court rightly rejected this extreme interpretation of the regulation's reach, declining to read it as a strict liability offense. In doing so, the court simply recognized the basic principle that to apply the regulation so would unconstitutionally punish on the basis of status alone without any proof of criminal intent. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The court therefore correctly concluded that the regulation only proscribes presence at a wreck scene with the intent to solicit business in violation of the wrecker-list regulatory regime, and that Robert's conduct as known to the police officers did not violate its proscription.

 In a fall-back position, the defendants contend that even if this is a proper interpretation of the regulation, it had not at the time been the subject of judicial interpretation. For this reason, they claim that neither the regulation's reach, nor the corresponding constitutional right now asserted not to be charged under it, could be considered "clearly established" at the time. We disagree. The fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless "clearly established" for qualified immunity purposes. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. "Clearly established" in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked. We agree with

the district court's determination that the specific right claimed here falls in that category. *See id.*

The district court was therefore correct in declining to grant the officers' motion for summary judgment in which they asserted entitlement to qualified immunity as a matter of law.

### B

It would appear that having so concluded, the court might well have gone further and rejected the qualified immunity defense as a matter of law. Robert has cross-moved for a "partial summary judgment" establishing the officers' liability on this claim. This necessarily sought an initial ruling that rejected their immunity defense. The court's conclusion, which we affirm, that the right alleged was clearly established (and violated), would appear necessarily to include a determination that a reasonably competent officer in the defendants' position would have known that charging Robert would violate that right. *See Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738 ("if the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent police officer should know the law governing his conduct"). As earlier indicated, there were no disputes about the officers' knowledge of Robert's conduct that might have raised factual issues bearing on the reasonableness of their conduct in citing him.

The district court did not, however, go this further step, and Robert has not, as he might have, cross-appealed from the court's failure to do so. Instead, the district court concluded that genuine issues of material fact required reserving the qualified immunity defense for trial. Specifically, the court identified as genuine issues the question whether the officers were motivated to avenge Robert's participation in the sting operation against their department, and the disagreements between various ones of the officers as to whether Robert should be cited. The court thought that these were material issues going to the objective reasonableness of the officers' mistaken probable cause determina-

tion: a vengeful motive presumably tending to disprove reasonableness; the disagreements, to prove it.

We disagree with that aspect of the district court's summary judgment ruling. As earlier indicated, the issue of the objective reasonableness of the officers' conduct was properly resolved against them by the district court's determination that the right asserted by Robert was a clearly established one. Illegal motive on the officer's part need not also be shown in order to defeat a qualified immunity defense to a Fourth Amendment claim which itself has no motive element. *See id.* at 816–19, 102 S.Ct. at 2737–39 (adopting objective-only test of official reasonableness); *cf. Musso v. Hourigan,* 836 F.2d 736, 743 (2d Cir. 1988) (where official's motive is essential element of constitutional right, such as First Amendment right, it is necessary to inquire into that motive even while applying "purely objective" *Harlow* test). Similarly, the fact that different ones of the officers may from time to time have disagreed on the existence of probable cause has effectively been trumped as evidence of the reasonableness of these officers' mistaken conduct by the court's legal determination that the right not to be charged here was a clearly established one of which *any* reasonably competent officer should have known.

So viewing the matter, we might be disposed to reject the officers' qualified immunity defense as a matter of law on this *de novo* review. Even if so disposed, however, we could not properly do so. As indicated, Robert has not cross-appealed from the district court's ruling. He is before us, therefore, only as an appellee who does not, and could not, seek relief which enlarges that given him by the district court's judgment. From his perspective, the effect of that judgment was merely to protect him from summary judgment in favor of the officers. Under the circumstances, we may only affirm that result. *See United States v. American Railway Express,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924) (where no cross-appeal taken, relief ordinarily limited to

affirmance). While we can only affirm the district court's refusal to grant the officers' summary judgment motion, we can do so on alternative grounds that modify the basis for the court's ruling, and, in consequence, its effect upon further proceedings. *See Tug Raven v. Trexler*, 419 F.2d 536, 548 (4th Cir.1969) (rule not inflexible).

With the question of the objective reasonableness of the officers' conduct properly resolved against them, there remains only one possible out for them under qualified immunity doctrine. Even where an officer has violated a right found by a court to be a "clearly established" one, he may yet establish his immunity to suit by "claim[ing] extraordinary circumstances and prov[ing] that he neither knew nor should have known of the relevant legal standard." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738.

This "extraordinary circumstance" out has not been too well developed by the courts since its announcement by the Supreme Court in the course of its adoption, in *Harlow*, of an objective-only test of official "good faith." *See generally* Note, *Qualified Immunity and the Allocation of Decision–Making Functions Between Judge and Jury*, 90 Col.L.Rev. 1045, 1047 & n. 22 (1990). As formulated, it presupposes that the right at issue is a clearly-established one of which any reasonably competent officer would be aware. It can therefore only be designed to immunize a particular officer for circumstances—"extraordinary" ones—that peculiarly excuse his failure to know what all in his position should know. This obviously does not include—and does not warrant re-visiting—questions of legal or factual ambiguity of the right. That, by definition will already have been decided against the officer. The extraordinary circumstance that excuses a particular officer's ignorance must instead be found in factors extrinsic to the text of law or decision or the facts defining the right at issue. Examples, as indicated, are few in the cases. Perhaps the most obvi-

ous possibility is mistaken official advice by legal counsel. *See Arnsberg v. United States*, 757 F.2d 971, 982 (9th Cir.1985); *but cf. Malley*, 475 U.S. at 345–46, 106 S.Ct. at 1098 (magistrate's issuance of warrant not excuse, as matter of law, for arresting officer's mistake as to probable cause); *Lowe v. Letsinger*, 772 F.2d 308, 314 (7th Cir.1985) (judge's direction to judicial clerk not excuse, as matter of law, for clerk's ignorance of right). We need not speculate about other extrinsic circumstances that might be found sufficiently "extraordinary" to excuse an individual officer's ignorance of well-established constitutional right. We do note that whether they exist in a particular case could raise issues of fact requiring trial, *see Llaguno v. Mingey*, 763 F.2d 1560, 1569 (7th Cir. 1985) (dictum), or, on the other hand, could be decided, on undisputed facts, as a matter of law under the test above suggested.

In this case, as indicated, the only way remaining to these officer-defendants to establish immunity is by proof of such extraordinary circumstances. As the case has developed they have not specifically invoked this theory. Under the circumstances, which find their qualified immunity defense still alive for possible establishment at trial, they should be allowed, if they can, to re-plead to assert such a theory. If they cannot, or if, having pleaded it, their proof fails, their qualified immunity defense fails.

We leave to the district court the exact procedure by which this opportunity for pleading and proof shall be provided. And of course, we must leave to that court for first instance consideration whether any circumstance advanced could, if proved, be deemed sufficiently "extraordinary," under the general test we have suggested, to excuse officer ignorance of the clearly established right at issue.[5]

## IV

We turn now to the procedural due process claim of Ben and the Garage.

---

5. In this connection, we observe that although, as indicated, the officers' motive is not directly in issue in their qualified immunity defense to this Fourth Amendment claim, evidence of their allegedly vengeful motive plainly would be relevant to rebut any claim of extraordinary circumstances they might advance.

As indicated, the district court rejected the defendant Alford's qualified immunity defense to this claim as a matter of law, concluding that the claimed right was a clearly established one which any reasonably competent official in Alford's position would have known would be violated by his conduct. We agree with that assessment.

Analyzed at the appropriate level, the right at issue is the right of Ben and the Garage not to be removed from the wrecker-list summarily—without any prior notice, opportunity to be heard, or other process. Since there is no dispute that they were so removed, the question whether the right was clearly established boils down to whether it was clearly established that being on this list was a constitutionally protected property right under the Fourteenth Amendment.

Alford has not disputed—and could not—that the general contours of the right at issue were clearly established at the critical time. That is to say, he does not dispute that any competent official in his position should know that the Fourteenth Amendment requires that before state-created property rights may be cut off by officials such as he, their owner must, to the extent possible, be given, at a minimum, notice and an opportunity to be heard why they should not be; that such property right can exist not only in land and personalty, but in government-provided benefits firmly enough grounded in law to constitute entitlements rather than mere expectations or desires; and that any such benefits having economic value may therefore constitute property rights subject to procedural due process protections. At this level of generality, the right asserted by Robert has of course long been "clearly established." *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

Alford's contention is narrowly that even if the state-created benefit of being on the wrecker-list is a protected property right under these established principles, that exact point was not clearly established at the critical time. He points out that at that time, no court had specifically so held, and he contends that whether this was a protected property right was therefore at least a reasonably arguable point among officials such as he. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096 (immunity warranted "if officers of reasonable competence could disagree" on the critical issues).

The district court rejected this contention, and we agree. It is true that no court at the time had specifically recognized a property right in being on this or comparable state-prescribed wrecker-service lists, but at least two did soon after. *See Abercrombie v. Catoosa,* 896 F.2d 1228 (10th Cir.1990); *Gregg v. Lawson,* 732 F.Supp. 849 (E.D.Tenn.1989). But as earlier noted, a specific prior adjudication of right is not necessary to make it one "clearly established" for qualified immunity purposes. We agree with the district court that any reasonably competent official in Alford's position charged, as they would be, with knowing the general due process principles above outlined, must also be charged with making the obvious application of those principles to the facts of this case. That being on the list was a benefit having economic value was manifest. Indeed, Alford indicated in deposition testimony that he recognized this about it. That being on it by virtue of this state regulatory regime insured that it was a legally enforceable entitlement rather than a mere unilateral expectation was also manifest to any reasonably competent official charged with knowledge, as they must be, of the regulatory regime they were required to enforce. As noted, the regulations required every highway patrol district to establish wrecker zones and "wrecker-rotation" lists for the zones, S.C.Code Regs. § 63–600(A)(8), and directed that the lists should be administered fairly and in a manner designed to ensure that all wrecker services on the list have an equal opportunity to the towing business arising from the rotation list. § 63–600(A)(10). Referred to these regulations, both Alford and his former superior, Lanier, indicated in deposition testimony that they understood them to create in wrecker services that satisfied the basic

eligibility requirements a right to be placed and remain on an appropriate list.

The district court rightly held that the specific constitutional right asserted by Ben and the Garage not to be removed summarily from the wrecker list was a clearly established right of which any reasonably competent official in Alford's position would have known. We therefore affirm the court's rejection, as a matter of law, of Alford's qualified immunity defense.

## V

In sum, we affirm the district court's denial of the motion of Payne and Williford for summary judgment, on qualified immunity grounds, as to Robert's Fourth Amendment claim, and the motion of Alford for summary judgment, on qualified immunity grounds, as to the procedural due process claim of Ben and the Garage. The action is therefore remanded for further proceedings in accordance with this opinion.

SO ORDERED.